STATE OF NORTH CAROLINA v. CONNIE HARDEE BRANCH AND ROY LEE SULLIVAN

No. 1

(Filed 17 December 1975)

### 1. Criminal Law § 92— consolidation of charges against two defendants

The trial court properly consolidated for trial charges against the two defendants for being accessories before the fact to the murder of the femme defendant's husband and for conspiracy to murder the femme defendant's husband.

### 2. Criminal Law § 66— suggestive photographic identifications — effect on in-court identification

Although the witness twice failed to identify the femme defendant during the trial and the photographic procedures before trial and during a noon recess were impermissibly suggestive since five photographs of only the femme defendant were shown to the witness, the photographic procedures did not give rise to a very substantial likelihood of irreparable misidentification and thus taint the witness's subsequent in-court identification of the femme defendant as the woman with whom he had talked about killing her husband where the witness had a substantial opportunity to observe and converse with the femme defendant in the front seat of his car, the witness had identified no other person prior to the pretrial photographic identification, the femme defendant had changed her appearance from the time the witness first saw her, and before viewing the photographs during the noon recess the witness had already privately identified the femme defendant from viewing her profile in the courtroom.

### 3. Criminal Law § 87; Witnesses § 9— redirect testimony — subject not covered on cross-examination

The trial court did not err in permitting a State's witness to testify on redirect examination concerning his identification of the femme defendant although no questions concerning her identity had been asked on cross-examination.

### 4. Criminal Law § 66— in-court identification — motion to reopen voir dire

The trial court did not abuse its discretion in the denial of defendant's motion made at the end of her cross-examination of a State's witness to reopen the *voir dire* examination concerning the in-court identification of her by the witness since ample evidence was presented during the *voir dire*, no new evidence was brought out on cross-examination of the witness, and there was ample opportunity originally to cross-examine all of the State's witnesses and offer independent evidence.

### 5. Criminal Law § 77— admissions — necessity for voir dire

In a prosecution for accessory before the fact to the murder of femme defendant's husband and conspiracy to murder him, the trial court did not err in the denial of the femme defendant's motion to conduct a *voir dire* on the admissibility of testimony by a witness as

State v. Branch

to admissions made to him over the telephone by the male defendant that the victim was killed by a State's witness for $5000 and that he and the femme defendant were in love and to be married where there was no indication that the male defendant's constitutional rights were violated before he made the admissions.

6. **Conspiracy § 5— testimony by co-conspirator prior to identification of defendant**

In a prosecution of two defendants for conspiracy to murder the femme defendant's husband, the trial court did not err in the admission against the femme defendant of testimony by a co-conspirator before his in-court identification of the femme defendant since wide latitude is allowed in the order of proof in a conspiracy case, and a *prima facie* case of conspiracy was developed against the femme defendant prior to the close of the evidence.

7. **Criminal Law §§ 73, 80— telephone calls — business records — hearsay**

Testimony by the revenue accounting manager of a telephone company as to the number of calls made between various telephone numbers was admissible under the business records exception to the hearsay rule since the actual records were duly authenticated and introduced into evidence; however, testimony by the accounting manager as to the number of calls between other numbers was inadmissible hearsay where no records were introduced into evidence, but error in the admission of such testimony was harmless beyond a reasonable doubt since there was plenary competent evidence concerning calls between those numbers and the inadmissible calls were only corroborative of testimony of the State's witnesses.

8. **Conspiracy § 5— telephone calls — relevancy**

In a prosecution for conspiracy to murder the femme defendant's husband, testimony concerning telephone calls made between telephones to which defendants and the killer had access was relevant to corroborate testimony of the State's witnesses and to show the close contact between the male defendant, the femme defendant and the killer during the course of the crime.

9. **Conspiracy § 5; Criminal Law § 79— acts of co-conspirator — admission against defendant**

In a prosecution for conspiracy to murder the femme defendant's husband, evidence that a $6,526.61 loan was made to the male defendant shortly before defendants paid a third person $5000 to commit the murder was admissible against the femme defendant since acts of a conspirator in furtherance of the conspiracy while the conspiracy was active are admissible against a co-conspirator when a *prima facie* case against the co-conspirator has been shown.

10. **Conspiracy § 5; Criminal Law § 79— declarations of co-conspirator — admission against defendant**

In a prosecution for conspiracy to murder the femme defendant's husband, testimony as to telephone calls between two witnesses and the male defendant concerning the male defendant's search for a person to commit the murder was properly admitted against the femme

State v. Branch

defendant as declarations of a co-conspirator in furtherance of the conspiracy while the conspiracy was active.

11. **Conspiracy § 5; Criminal Law § 79— declarations of co-conspirator after conspiracy ended — inadmissibility against defendant**

In a prosecution for conspiracy to murder the femme defendant's husband, testimony as to the male defendant's telephone call to the killer following the killing to find out whether "the heat was on" the killer was improperly admitted against the femme defendant since declarations of a conspirator made after the conspiracy has ended are not admissible against the other conspirators; however, the admission of such testimony against the femme defendant was harmless error since the testimony did not implicate the femme defendant and there was plenary competent evidence to show that the two defendants conspired to kill the femme defendant's husband.

12. **Conspiracy § 5; Criminal Law § 79— declarations of co-conspirator after conspiracy ended — inadmissibility against defendant — harmless error**

Testimony that the male defendant told the witness by telephone that a third person had killed the femme defendant's husband for $5000 and that defendants were in love and to be married was improperly admitted against the femme defendant since the testimony involved declarations made outside the presence of the femme defendant after the conspiracy to kill the femme defendant's husband had ended; however, the admission of such testimony was harmless error since the facts related in the telephone conversation about the femme defendant were established by plenary competent evidence and there was overwhelming evidence showing the femme defendant's participation in the crime.

13. **Criminal Law § 81— best evidence rule — tape recording of telephone conversation**

The best evidence rule did not require the exclusion of testimony as to a telephone conversation by one of the participants in the conversation on the ground that a tape recording of the conversation was available.

14. **Conspiracy § 5— telephone call between conspirators — competency**

In a prosecution for conspiracy to murder the femme defendant's husband, evidence of a telephone call allegedly made by the femme defendant to the male defendant from a hospital after the femme defendant's husband was shot but before his death was competent as circumstantial evidence of a continuing conspiracy.

15. **Criminal Law § 95— illustrative exhibits — no limiting instruction when admitted**

The trial court did not err in refusing to give an instruction at the time exhibits were admitted that they were being admitted only for the limited purpose of illustrating the witness's testimony where the court instructed the jury in the first portion of its charge that the exhibits were admitted only for such purpose.

State v. Branch

16. **Conspiracy § 6— conspiracy to murder — sufficiency of evidence**

The State's evidence was sufficient to be submitted to the jury on the issue of the femme defendant's guilt of conspiracy to murder her husband where it tended to show that the femme defendant expressed to the killer her desire, both privately and in concurrence with the male defendant, to have her husband killed and that she participated in planning the killing.

17. **Criminal Law § 10— accessory before the fact**

An accessory before the fact is one who counseled, procured, commanded ·or encouraged the principal to commit the crime but who· was not present when the crime was committed.

18. **Criminal Law § 10; Homicide § 21 —accessory before fact to murder — sufficiency of evidence**

The State's evidence was sufficient to be submitted to the jury on the issue of femme defendant's guilt as an accessory before the fact to the murder of her husband.

19. **Criminal Law § 99— conduct of trial — impartiality — no expression of opinion**

The trial judge did not conduct a trial in a partial manner or express an opinion in violation of G.S. 1-180 when he suggested that defense attorneys object in a certain order, stated reasons for sustaining some defense objections, sustained his own objection on one occasion and stated the reason therefor, and asked witnesses various clarifying questions and gave numerous instructions to facilitate the jury's role and maintain order in the court.

20. **Conspiracy § 5; Criminal Law § 128— erroneous admission of evidence — violation of sequestration order — unavailability of tape recording — motions for mistrial**

In a prosecution for conspiracy to murder the femme defendant's husband, the trial court did not err in the denial of the femme defendant's motions for mistrial made when the court erroneously admitted evidence of declarations of the male defendant which were merely narrative of what the femme defendant had done or wanted done and erroneously admitted hearsay testimony, or when the prosecutor, after soliciting from the killer the testimony that he was a married man, stated, "I just want to let it all come out, Mr. Whealton," since the testimony and statement were insignificant in context with the plenary competent evidence offered by the State, and the court allowed defendant's motion to strike them and instructed the jury to disregard them; nor did the court err in failing to declare a mistrial when two deputy sheriffs violated a sequestration order by showing photographs of the femme defendant to a State's witness during a recess, or when a tape recording of a telephone conversation became unavailable to defendant because the officer in possession of it had gone to South Carolina to testify in another case and had become ill.

21. **Criminal Law § 114— necessity for charging on circumstantial evidence — statements by court — reference to direct evidence — no expression of opinion**

The trial court did not express an opinion in instructing the jury that the court did not have to charge the jury on circumstantial

evidence since there was direct or eyewitness evidence that defendants committed the crimes charged, but that the court was charging on circumstantial evidence because there was some circumstantial evidence.

**22. Criminal Law § 112— charge on circumstantial evidence**

In the absence of a specific request, the trial court did not err in failing to charge concerning circumstantial evidence that "before any circumstance upon which the State relies may be considered by you as tending to prove the guilt of either defendant, the State must prove that circumstance beyond a reasonable doubt."

**23. Criminal Law § 113— failure to recapitulate certain evidence**

The trial court did not err in failing to include in its recapitulation of the evidence that a witness on two occasions during direct examination failed to identify the femme defendant where the jury was reminded of the witness's initial failures when the court instructed the jury as to the circumstances enabling the witness to identify the femme defendant during redirect examination, and defendant failed to request such instruction.

**24. Criminal Law § 114— instructions — reference to defendants in the conjunctive**

The trial court did not express an opinion on the evidence in a portion of the charge referring to defendants in the conjunctive where the charge, when considered contextually, made it clear that the guilt or innocence of each defendant was to be judged separately.

**25. Criminal Law § 10; Homicide § 12— accessory before fact — sufficiency of indictment**

A bill of indictment was sufficient to charge the offense of accessory before the fact to murder although it did not specifically allege that defendant was not present at the time the offense was committed.

**26. Criminal Law § 84— fruit of poisonous tree — tape recording of telephone call — legality**

The testimony of a State's witness was not inadmissible as fruit of the poisonous tree on the ground that defendant's telephone conversation with a third person was recorded on tape where the recording was made with the third person's consent and was thus legal, and the testimony of the State's witness was obtained by means sufficiently distinguishable from the tape recording that it was purged of any primary taint.

**27. Criminal Law § 87— admission of testimony — necessity for voir dire**

The trial court did not err in the admission of the testimony of a State's witness without allowing a *voir dire* examination of him where there was nothing in the record to indicate any viable basis for excluding the witness's testimony.

**28. Criminal Law § 21— necessity for preliminary hearing**

At the time of defendant's trial, a defendant could properly be tried on a bill of indictment without the benefit of a preliminary hearing.

State v. Branch

29. **Criminal Law § 80; Constitutional Law § 31— denial of motion for pretrial discovery**

The trial court did not err in the denial of defendant's motion for pretrial discovery of a tape recording and photographs since there was nothing to indicate the tape recording was to be used in the trial, there was no right to pretrial discovery of photographs, and the photographs would have been of little benefit to defendant; nor did the court err in the denial of the remainder of defendant's motion for pretrial discovery since it failed to specify the information sought and amounted to a fishing expedition for information. Former G.S. 15-155.4.

30. **Constitutional Law § 31— access to exculpatory evidence — denial of motion for pretrial discovery**

Defendant was not denied the right to have access to exculpatory evidence by the denial of his pretrial motion for discovery where defendant failed to show that any evidence favorable to him was suppressed.

31. **Criminal Law § 100— permitting private prosecutor**

The trial court did not err in allowing a private prosecutor to assist in the prosecution of defendant on charges of accessory before the fact of murder and conspiracy to commit murder.

32. **Criminal Law § 91— motion for continuance — employment of additional counsel**

The trial court did not err in the denial of defendant's motion for a continuance to allow defendant to employ additional counsel or in the failure to advise defendant of his right to proceed without counsel.

33. **Criminal Law § 22— counsel's misstatement of plea — no instruction to disregard**

Where counsel for defendant stated that defendant entered a plea of guilty to both charges, defendant thereupon stated, "Not guilty," and defendant's counsel replied, "I beg your pardon. Not guilty," the court did not err in failing to instruct the jury to disregard counsel's misstatement concerning the plea since the jurors present could not have misunderstood what occurred.

34. **Conspiracy § 5— telephone calls between conspirators — statements of conspirators — admissibility**

In a prosecution for conspiracy to murder the femme defendant's husband, testimony of a mobile telephone operator that defendants had told her that they were going to get married and that she had heard defendants conversing over the telephone fifteen or twenty times during the three months preceding the murder was competent on the question of the existence of a conspiracy.

35. **Conspiracy § 3; Criminal Law § 10— conspiracy to murder — accessory before the fact — no merger of crimes**

The crime of conspiracy to commit murder does not merge into the crime of accessory before the fact of murder, and defendant was properly convicted of both crimes.

36. **Conspiracy § 5; Criminal Law § 10; Homicide § 21— conspiracy to murder — accessory before fact to murder — sufficiency of evidence**

The State's evidence was sufficient to be submitted to the jury on the issue of the male defendant's guilt of accessory before the fact to the murder of the femme defendant's husband and conspiracy to murder the femme defendant's husband.

Chief Justice SHARP and Justice BRANCH concur in the result.

APPEAL by defendant pursuant to G.S. 7A-27(a) and G.S. 7A-31(a) from *Judge Perry Martin,* 14 October 1974 Criminal Session of PITT Superior Court.

Each defendant was indicted and convicted upon separate bills for accessory before the fact to the murder of Linwood Branch on 29 March 1974 and for conspiracy to commit murder. The cases were consolidated for trial over objection of defendant Branch. Each defendant received sentences of life imprisonment and ten years imprisonment on the respective charges.

The State offered evidence which tended to show the facts summarized below.

Matthew Jack Whealton, the principal witness against the defendants, admitted shooting a man whom he thought was the victim, Linwood Branch. Defendant Connie Hardee Branch was the wife of the deceased and she was apparently having an affair with defendant Roy Lee Sullivan. Whealton testified that in exchange for his turning State's evidence, the prosecution agreed not to seek the death penalty for his part in the death of Mr. Branch.

Whealton's further testimony was substantially as follows. His first contact with Sullivan was by telephone in December, 1973. Later they arranged to meet at an airport terminal in Norfolk, Virginia, in February, 1974. They met as planned and drove to a motel at Virginia Beach where Sullivan offered Whealton $4,000 to find someone to kill Mr. Branch. Whealton replied that he might be able to find such a person. Subsequently he told Sullivan by telephone that he had found someone, but the price would be $5,000.

Around 1 March 1974 Whealton met a woman who introduced herself as Connie Branch at the Fass Seafood House in Washington, North Carolina. She sat in the front seat of his car in the restaurant parking lot and told him that she wanted her husband killed because they would lose the child they were try-

ing to adopt if she got a divorce. She indicated that she would not mind if an innocent man were convicted if Whealton killed her husband. Sullivan soon joined them. He kissed Mrs. Branch on arrival. They proceeded to discuss their plans for the killing. Both Sullivan and Mrs. Branch wanted it "to look like a robbery" and suggested it take place by the carport of the Branch home which was in or near Greenville, North Carolina. Sullivan gave Whealton some pictures of Mr. Branch and offered him a $5,000 check. Whealton refused to take the check and insisted on cash. Following this meeting, Whealton received numerous telephone calls from Sullivan inquiring about the progress of the plans.

At a meeting in mid-March Sullivan gave Whealton $5,000 in cash. Whealton returned to his home in Chesapeake, Virginia, and called one Harold Wiseman who agreed to help him with the planned killing. Whealton bought a .38 caliber pistol and a .32 caliber pistol, giving the .32 caliber pistol to Wiseman along with $2,500.

On 19 March 1974 Whealton and Wiseman came to North Carolina to kill Branch. When he was located, they were unable to kill him because someone was with him, whereupon they went back to Virginia. They returned to North Carolina on 21 March 1974, but were too intoxicated to do anything and drove back to Virginia.

On 27 March 1974 Sullivan and Mrs. Branch contacted Whealton by telephone at Earl's Market in Chesapeake, Virginia, and inquired as to when he would kill Branch. On Friday, 29 March 1974, Whealton and Wiseman returned to North Carolina. Sullivan advised them that Branch had a different car, a 1968 Buick Skylark, and told them Branch was expected to arrive at his home around 10:00 that evening. Whealton drove Wiseman to the Branch home around 8:30 or 9:00 p.m., and Wiseman got out of the car to await Branch's arrival. However, Wiseman apparently lost his nerve, and in ten or fifteen minutes Whealton saw him walking away from the Branch home. Soon thereafter Whealton saw Branch drive into his driveway. He followed him in his vehicle and called to him by name, "Linwood." Branch walked toward the car in which Whealton was seated. When he was about fifteen feet away, Whealton shot him. Branch continued walking toward the Whealton car, stumbled, and fell against the car. Whealton pushed Branch away and left the scene. On the way back to Virginia, Whealton threw the

.38 caliber pistol he had used into the Albemarle Sound. The next day, Saturday, Sullivan called Whealton to say Branch had not died and then on Monday called to say he was dead.

Whealton identified Sullivan in the courtroom without hesitation. However, he twice was unable to identify Mrs. Branch during the first part of his testimony. After the two-hour noon recess of the first day of court, during which Whealton saw five pictures of Mrs. Branch taken at different times, he was able to make an in-court identification of her as the woman he had met at the Fass Seafood Restaurant about 1 March 1974. Mrs. Branch had changed the style and color of her hair and put on glasses since her meeting with Whealton. He said that he was able to recognize her after she turned and he saw her profile. He also stated that he first made a positive identification of her some time after the first two requests for an identification in court and before he saw the five pictures during the noon recess. A subsequent examination of Deputy Sheriff Dalton Respass, who had spoken with Whealton and shown him the pictures during the noon recess in violation of the court's sequestration order, verified Whealton's testimony that Mrs. Branch's appearance was changed. Cross-examination of Respass revealed that he had shown the same pictures of her to Whealton about two weeks before the trial and that he had identified her then. Other witnesses substantially corroborated the testimony of Whealton.

Further evidence of the State tended to show: that deceased died as a result of a pistol wound to the head; that Whealton, in the company of Gloria Allsbrook and Wiseman, was at the Lemon Tree Inn in Chocowinity (about twenty miles from Greenville) on at least three occasions, including 29 March 1974; that Sullivan borrowed $6,526.61 from a loan company on 11 March 1974 to buy a crop dusting plane, but no plane was bought; that within one day of the loan the check was cashed and $1,025.00 of it was deposited; that Sullivan in the presence of Mrs. Branch said he was going to marry her and exhibited wedding rings; that Sullivan and Mrs. Branch were frequently seen together in the first three months of 1974 and particularly were seen alone together at the Kinston Stock Yard for thirty minutes on 24 March 1974; that Sullivan had telephone conversations with two men in South Carolina and asked them if they could find a killer, telling one of them that the intended victim was the husband of his girl friend.

Additionally, the State introduced into evidence numerous telephone records. These records showed the following telephone calls: (1) a call on 8 March 1974 between the Cline Chevrolet dealership in Virginia where Whealton and Wiseman worked, and Sullivan's telephone in Kinston; (2) a call on 9 March 1974 from another Cline Chevrolet location in Virginia and Sullivan's telephone in Kinston; (3) numerous calls (one in April, eighteen in March, seventeen in February, and six in January) from the telephone of Better Homes Realty Company, Greenville, which listed defendant Connie Branch as the owner, to Sullivan's telephone in Kinston; (4) numerous calls (twenty-five in March, six in February, and one in January) from the telephone for Branch's General Store in Greenville listed in the name of L. N. Branch (the deceased) to the telephone of Sullivan; (5) three calls on 19 March 1974 from the Lemon Tree Inn, Chocowinity, where other records indicated Whealton registered on 19, 20 and 29 of March 1974, to Sullivan's telephone; (6) one four-minute call at 8:07 a.m. on 30 March 1974 from a Pitt Memorial Hospital pay telephone (the name "Connie" was noted on the record) to Sullivan's telephone; and (7) numerous other calls noted in the body of the opinion. Many of these telephone calls corroborated testimony of Whealton as to the calls he made or received and the close contact between Sullivan and Mrs. Branch.

Defendants presented no evidence.

*Attorney General Rufus L. Edmisten by Special Deputy Attorney General Sidney S. Eagles, Jr., for the State.*

*Paul, Keenan, Rowan & Galloway by James V. Rowan for Roy Lee Sullivan and James, Hite, Cavendish & Blount by Dallas Clark, Jr., for Connie Hardee Branch; for defendant appellants.*

COPELAND, Justice.

Defendant Branch raises 42 assignments of error covering 1144 exceptions. Defendant Sullivan raises 38 assignments of error covering 478 exceptions.

The questions raised by defendant Branch (hereinafter referred to as "Mrs. Branch") will be considered first.

## MRS. BRANCH'S APPEAL

[1]   Mrs. Branch contends that it was error for the court to consolidate the cases of defendants for trial. G.S. 15-152 (formerly C.S., 4622) has been consistently interpreted as follows: "The court is expressly authorized by statute in this State to order the consolidation for trial of two or more indictments in which the defendant or defendants are charged with crimes of the same class, which are so connected in time or place as that evidence at the trial of one of the indictments will be competent and admissible at the trial of others. C.S. 4622. [Citations omitted.]" *State v. Combs,* 200 N.C. 671, 674, 158 S.E. 252, 254 (1931).

Our case clearly falls within the above guidelines. The defendants were charged with being accessories before the fact to the murder of Mr. Branch and with conspiracy to murder him. The defendants were so connected in time and place that the evidence at the trial of one would be competent and admissible at the trial of the other. The assignment of error is without merit and is overruled.

[2]   Mrs. Branch next contends that the in-court identification of her by Whealton was improper and tainted on account of the five pictures shown to him during the noon recess. Actually, there was a photographic identification about two weeks before the trial as well as the one (attempted) during the noon recess. On both occasions Deputy Sheriff Dalton Respass showed five isolated pictures of Mrs. Branch to Whealton. Mrs. Branch moved to strike, and requested and received a voir dire examination as to Whealton's in-court identification. However, when Respass subsequently testified and for the first time informed the court that he had shown the same pictures to Whealton two weeks before the trial, Mrs. Branch failed to object, move to strike, or request to reopen the voir dire examination as to Whealton's in-court identification. She neither contended that new evidence had been discovered, nor that she had been surprised. Nonetheless, on account of the serious nature of this case and the fact that a general objection to the in-court identification was made, the effect of this related identification two weeks before the trial will be considered by our Court *ex mero motu* under this assignment of error.

"[E]ach case must be considered on its own facts, and . . . convictions based on eyewitness identification at trial following

State v. Branch

a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 U.S. 377, 384, 19 L.Ed. 2d 1247, 1253, 88 S.Ct. 967, 971 (1968). "Factors to consider in applying the *Simmons* test are: '(1) the manner in which the pretrial identification was conducted; (2) the witness's prior opportunity to observe the alleged criminal act; (3) the existence of any discrepancies between the defendant's actual description and any description given by the witness before the photographic identification; (4) any previous identification by the witness of some other person; (5) any previous identification of the defendant himself; (6) failure to identify the defendant on a prior occasion; and (7) the lapse of time between the alleged act and the out-of-court identification.' [Citations omitted.]" *State v. Knight,* 282 N.C. 220, 225, 192 S.E. 2d 283, 287 (1972).

An analysis of this case in the light of these factors indicates that both identification procedures were impermissibly suggestive since in each instance Deputy Sheriff Respass showed pictures of only one woman, Mrs. Branch, to Whealton. However, an examination of the other factors involved shows that these photographic identification procedures did not give rise to a "very substantial likelihood of irreparable misidentification." Whealton had a substantial prior opportunity to observe and converse with Mrs. Branch in the front seat of his car during the early afternoon around 1 March 1974. He observed her get out of her car and walk over to his car. He had made no prior description of her. Therefore, the factor relating to prior descriptions is inapplicable. Before seeing and identifying the pictures of her about two weeks in advance of the trial, he apparently neither made nor attemped to make an identification of her or some other person as the woman he met around 1 March 1974. Moreover, by the time he saw the pictures during the noon recess, he had *already* privately *identified* Mrs. Branch from a profile view of her in the courtroom and reported this to Respass. Thus, the second showing of the pictures could not properly be deemed to have affected his subsequent in-court identification. Whealton did twice fail to identify her on the witness stand, but this was understandable considering the circumstances. Both Whealton and Respass stated that the color of her hair had been changed and she was wearing glasses now, whereas they had not previously seen her wearing glasses. Also, Respass indicated

that the style of her hair had been changed since he saw her on 30 March 1974. The two pictures which were presented with the record on appeal and had been taken on 26 April 1974 and five or six days thereafter show a dramatic difference in the appearance of Mrs. Branch. An additional circumstance is that over seven months had passed since Whealton had seen her around 1 March 1974. Additionally, Whealton stated he was able to identify her *when he saw her profile.* Apparently, he had not seen or examined her profile when the first two requests for an in-court identification were made. Thus, on the basis of these facts the photographic identification some two weeks before the trial did not give rise to a "very substantial likelihood of irreparable misidentification" and taint Whealton's in-court identification. Moreover, the trial court's finding that the in-court identification was not tainted or influenced by the pictures shown during the noon recess was fully supported by the evidence and must be upheld. *State v. Knight, supra; State v. Morris,* 279 N.C. 477, 183 S.E. 2d 634 (1971) ; *State v. Gray,* 268 N.C. 69, 150 S.E. 2d 1 (1966). This assignment of error is overruled.

[3] Mrs. Branch also challenges the in-court identification because the court allowed the State during redirect examination to examine Whealton on the identity of the woman he met around 1 March 1974 even though no questions concerning her identity had been asked on cross-examination. As indicated in 1 Stansbury, North Carolina Evidence, § 36 (Brandis Rev. 1973), and cases cited thereunder, "The trial judge may, however, in his discretion vary the regular order and permit counsel to elicit on redirect examination *new evidence* which was *inadvertently omitted* on the examination in chief." (Emphasis supplied.) Since Whealton had not seen the woman he met around 1 March 1974 for over seven months, since her appearance was changed considerably, and since there is nothing to indicate that Mrs. Branch presented a profile view when Whealton failed to identify her, the trial judge clearly did not abuse his discretion. This assignment of error is overruled.

[4] Mrs. Branch also contends that the court erred in denying her motion at the end of her cross-examination of Whealton to reopen voir dire examination concerning the in-court identification of her by Whealton. This is discretionary with the court and it appears there was no abuse of discretion since, (1) there was a right to confront her with adverse witnesses during the voir

dire; (2) ample evidence was produced during the voir dire; (3) no new evidence had been brought out on her cross-examination of Whealton; and (4) there was ample opportunity originally to cross-examine all of the State's witnesses and offer independent evidence. Where no voir dire was conducted, our Court has said: "Failure to conduct the voir dire, however, does not necessarily render such evidence incompetent. Where, as here, the pretrial viewing of photographs was free of impermissible suggestiveness, and the evidence is clear and convincing that defendant's in-court identification originated with observation of defendant at the time of the robbery and not with the photographs, the failure of the trial court to conduct a voir dire and make findings of fact, as he should have done, must be deemed harmless error. [Citation omitted.]" *State v. Stepney,* 280 N.C. 306, 314, 185 S.E. 2d 844, 850 (1972). A similar rationale applies here with respect to reopening voir dire, and, if there was error, it was harmless beyond a reasonable doubt since the photographic identification did not give rise to a "very substantial likelihood of misidentification" based upon the considerable evidence presented. *Chapman v. California,* 386 U.S. 18, 17 L.Ed. 2d 705, 87 S.Ct. 824 (1967); *State v. Brinson,* 277 N.C. 286, 177 S.E. 2d 398 (1970). Thus, all assignments of error pertaining to identification are overruled.

[5] Defendant next assigns as error denial of her motion to conduct a voir dire of witness Bennett (from South Carolina) who testified that Sullivan told him on the telephone that Branch was killed by Whealton for $5,000 and that he and Connie Branch were in love and to be married. Defendant cites no cases and we have searched and found no cases supporting the proposition that a voir dire is mandatory in such a situation. Rather, the general rule is that the conduct of the trial is within the discretion of the trial judge, and he will be upheld on appeal in the absence of an abuse of discretion. *See* 7 Strong, N. C. Index 2d, Trial, §§ 5 and 9. The rule is that it is within the trial court's discretion to decide whether a voir dire will be held as to testimony concerning admissions by a defendant when neither defendant nor the facts indicate there is a possible violation of the Constitution of North Carolina or of the Constitution of the United States on account of duress, coercion or a violation under *Miranda v. State of Arizona,* 384 U.S. 436, 16 L.Ed. 2d 694, 86 S.Ct. 1602 (1966). The admissions of Sullivan to Bennett did not arise from force or on account of a custodial interrogation. We will consider the hearsay nature of the admission

of the actual evidence presented and its effect in subsequent assignments of error. There was no abuse of discretion in denying the voir dire motion, and this assignment of error is overruled.

[6] In separate assignments of error Mrs. Branch contends that the testimony of Whealton occurring before his in-court identification of her should have been stricken and that as to Mrs. Branch, the jury should have been instructed to disregard this testimony. "The general rule is that when evidence of a *prima facie* case of conspiracy has been introduced, the acts and declarations of each party to it in furtherance of its objectives are admissible against the other members. [Citations omitted.]" *State v. Conrad*, 275 N.C. 342, 348, 168 S.E. 2d 39, 43 (1969). "Because of the nature of the offense [of conspiracy] courts have recognized the inherent difficulty in proving the formation and activities of the criminal plan and have allowed wide latitude in the order in which pertinent facts are offered in evidence. '[A]nd if at the close of the evidence every constituent of the offense charged is proved the verdict rested thereon will not be disturbed. . . . ' [Citations omitted.]" *State v. Conrad, supra*, at 347, 168 S.E. 2d at 43. Defendant's primary contention is that the in-court identification of Mrs. Branch by Whealton was tainted and, consequently, there was no *prima facie* case of a conspiracy with Mrs. Branch. However, this Court has determined that the in-court identification was proper. Thus, there was plenary direct evidence as well as circumstantial evidence connecting her with the conspiracy and establishing a *prima facie* case of her conspiracy. This assignment of error is overruled.

We have carefully considered Mrs. Branch's additional assignments of error with respect to the testimony of Whealton and find them to be without merit.

[7] Next, Mrs. Branch contends that it was prejudicial error to allow into evidence the testimony of Moodie H. Ward, Bonnie Daniels, and Susan Bishop as to various telephone calls and service.

Mr. Ward, Revenue Accounting Manager for Carolina Telephone and Telegraph Company, testified as to the following: (1) 334 calls from the telephone of William I. Sullivan where defendant Roy Lee Sullivan was living with his parents in Kinston, N. C., to the telephone of Branch's General Store in

Greenville, N. C., listed in the name of L. N. Branch (the deceased) (December 1973 to 29 March 1974) ; (2) 73 calls from the telephone of William I. Sullivan in Kinston to the telephone of the Better Homes Realty Co., Greenville, which listed Connie Branch as the owner (20 December 1973 to 29 March 1974) ; (3) 17 calls from the telephone of William I. Sullivan in Kinston to the telephone of Cline Chevrolet in Virginia where Whealton worked (19 March 1974 to 22 March 1974) ; (4) 30 calls from William I. Sullivan's telephone in Kinston to the telephone of M. J. Whealton in Hickory, Virginia, (4 March 1974 to 30 March 1974) ; (5) 26 calls from William I. Sullivan's telephone in Kinston to the telephone of Noah T. Hardee, the father of Connie Branch (and with whom she had been living), in Greenville (11 January 1974 to 11 April 1974) ; (6) the telephone numbers and kinds of service for the first months of 1974 for Pitt Memorial Hospital, Greenville; Willie Nelson Stables, Greenville; Lemon Tree Inns of America, Inc., Washington; (7) 42 calls from the Better Homes Realty Co., Greenville, to the telephone of William I. Sullivan in Kinston (18 January 1974 to 25 March 1974) ; (8) 25 calls from the telephone of Branch's General Store in Greenville to the telephone of William I. Sullivan in Kinston (21 January 1974 to 29 March 1974) ; (9) 1 twenty-one minute call from the telephone of Noah T. Hardee in Greenville to the telephone of William I. Sullivan (6 :29 p.m., 29 March 1974) ; (10) 3 calls from the telephone of the Lemon Tree Inn, Chocowinity, N. C., to the telephone of William I. Sullivan in Kinston (19 March 1974). These ten groupings of telephone service and 551 calls will be referred to by number.

"Evidence, oral or written is called hearsay when its probative force depends, in whole or in part, upon the competency and credibility of some person other than the witness by whom it is sought to produce it." *State v. Robbins,* 275 N.C. 537, 547, 169 S.E. 2d 858, 864-865 (1969). 1 Stansbury, *supra,* § 138 at 458.

Since Mr. Ward did not have firsthand knowledge of the telephone service and telephone calls to which he testified, his testimony was hearsay and inadmissible absent an exception to the hearsay rule.

The telephone calls in Groups (7) through (10) were admissible under the business records exception to the hearsay rule since the actual records were duly authenticated and introduced into evidence by a qualified official. However, as to

Groups (1) through (5) no actual records were introduced into evidence and, therefore, the testimony in those groups was not admissible under any exception to the hearsay rule. *Supply Co. v. Ice Cream Co.*, 232 N.C. 684, 61 S.E. 2d 895 (1950); 1 Stansbury, *supra*, § 155; McCormick, Evidence, Chapter 31 (2d ed. 1972). Nonetheless, a careful examination of the entire record indicates that there was plenary admissible evidence of telephone calls made between the same telephones in Groups (1) through (5) when the transmitting and receiving ends were reversed. (See the first six groups of calls in the initial discussion of the facts for this case and the calls in Groups (7) through (10) of this section of the opinion.) Also, the State produced substantial other evidence implicating defendants. Furthermore, these inadmissible telephone calls were essentially only corroborative of the testimony of Whealton and other witnesses and did not even reveal the substance of the conversations. Therefore, when Mr. Ward, who was duly qualified as a custodian of these business records, testified as to his recollection of the information recited in Groups (1) through (5), it was harmless error beyond a reasonable doubt. *State v. Jones*, 280 N.C. 322, 185 S.E. 2d 858 (1972); *Chapman v. California, supra*. A similar rationale applies as to the testimony given in Group (6) as to telephone numbers and service. This assignment of error is overruled.

[8] Mrs. Branch additionally contends these telephone calls were irrelevant or solely intended to arouse the prejudice of the jury. However, these telephone calls were properly shown to be related to telephones to which defendants had access and were relevant to corroborate the testimony of the State's witnesses and to show the close contact between Sullivan, Mrs. Branch, and Whealton throughout the course of the crime. This was further circumstantial evidence of the conspiracy. Defendant's assignments of error as to these numerous telephone calls are overruled.

[9] Mrs. Branch next contends that it was error to deny her motion that the jury be instructed that the testimony concerning a check and loan for $6,526.61 made to Sullivan on 11 March 1974 be limited to defendant Sullivan. This evidence was relevant and material as circumstantial evidence of acts of a coconspirator in furtherance of the objectives of the conspiracy while the conspiracy was active. In particular, this evidence showed that, shortly before the alleged mid-March payment of

$5,000 in cash to Whealton, Sullivan had $5,501.26 in cash and that this money was not used to buy a plane for crop dusting as he represented to the loan company. Under these circumstances, this evidence was properly admitted against Mrs. Branch since a *prima facie* case of conspiracy between Mrs. Branch and Sullivan had already been established by the State. *State v. Lee,* 277 N.C. 205, 176 S.E. 2d 765 (1970) ; *State v. Conrad, supra;* 2 Stansbury, N. C. Evidence, § 173 (Brandis Rev. 1973).

[10]  Our next question is whether the trial court erred in admitting into evidence as against Mrs. Branch the testimony of witnesses Lucarelli and Bennett concerning telephone conversations which each witness had with defendant Sullivan. The purpose of the telephone conversations concerned Sullivan's search for a killer. In fact, Sullivan told Lucarelli that the husband of his girl friend was the intended victim. These conversations were clearly in furtherance of the plan to kill Branch. Whealton's testimony as to Mrs. Branch's desire to have her husband killed was circumstantial evidence that she might have originated the plan to find somebody to kill her husband. Since the testimony of numerous witnesses revealed that Mrs. Branch and Sullivan were having an affair and further indicated that they had been acting in concert from the inception of this plan, a *prima facie* case of conspiracy between Mrs. Branch and Sullivan was established before these telephone conversations took place. Testimony as to these conversations with Sullivan was properly admitted against Mrs. Branch under the same "coconspirator rule" that was applicable in the previous assignment of error. Specifically, when a *prima facie* case of conspiracy has been introduced, the declarations and acts of any one of the conspirators, made or done while the conspiracy is in existence and in furtherance of the common illegal design, are admissible against other conspirators. 2 Stansbury, *supra,* § 173 and cases cited therein. The assignment of error is overruled.

[11]  Mrs. Branch assigns as error the admission of the testimony of Bennett concerning Sullivan's telephone call to him in April immediately following the killing to find out whether or not "the heat was on" Whealton. "[T]he declaration or act of one is not admissible in evidence as against other members of the conspiracy if it was made after the termination of the conspiracy. . . . This is true whether the conspiracy is terminated by the achievement of its purpose or by the failure to achieve

it." 16 Am. Jur. 2d, Conspiracy, § 40, at 148; *State v. Little-john,* 264 N.C. 571, 142 S.E. 2d 132 (1965). "[D]eclarations of one of the conspirators, made after the offense has been committed and in the absence of the others, are not competent against the others, because not uttered in furtherance of the common design. *S. v. Dean,* 35 N.C., 63." *State v. Ritter,* 197 N.C. 113, 116, 147 S.E. 733, 734 (1929). Thus, it was error to admit this testimony as to Sullivan's conversations after Branch had been killed and the objective of the conspiracy had been achieved. However, the error committed was harmless beyond a reasonable doubt since this evidence standing alone in no way implicated Mrs. Branch and since there was plenary other evidence showing that Mrs. Branch and Sullivan conspired to kill Branch. *Chapman v. California, supra; State v. Brinson,* 277 N.C. 286, 177 S.E. 2d 398 (1970). The assignment of error is overruled.

[12]    Next, Mrs. Branch assigns as error the admission of the testimony of Bennett concerning a subsequent telephone call in April from Bennett to Sullivan to find out more information about the killing. In this subsequent call, Sullivan related that Whealton killed Branch for $5,000 and that he (Sullivan) and Mrs. Branch were in love and to be married as soon as possible. Since this testimony involved declarations made outside the presence of Mrs. Branch and after the conspiracy to kill Mr. Branch had been terminated by the achievement of its purpose, it was error to admit this testimony against Mrs. Branch. *State v. Ritter, supra.* However, an examination of the record shows that Mrs. Branch was not prejudiced by the admission of this testimony. Although reference was made to Mrs. Branch in this conversation, the very facts related about her were established by plenary other evidence. In brief, Sullivan and Mrs. Branch had been seen alone together on several occasions for extended periods. They were frequently in contact with each other and had been seen kissing each other. Also, Sullivan, in the presence of Mrs. Branch, had stated that they were to be married and had displayed wedding rings. Furthermore, the fact that Sullivan and Mrs. Branch were in love and to be married did not *directly* implicate her in the crimes charged. Moreover, there was overwhelming evidence, especially considering Whealton's testimony and identification of Mrs. Branch, showing her involvement in the crime charged. Thus, the error committed was harmless beyond a reasonable doubt. *Chapman v. California,*

*supra; State v. Brinson, supra.* The assignment of error is over-ruled.

[13]   Mrs. Branch also claims that it was error to admit the testimony concerning the above subsequent telephone call from Bennett to Sullivan because a tape recording of the conversation was available and in possession of the prosecuting attorneys. She contends that the tape recording was the best evidence of that conversation. The best evidence rule requires the production of the original writing if it is available in preference to other species of evidence *where the contents or terms of that writing are in question. State v. Fox,* 277 N.C. 1, 175 S.E. 2d 561 (1970) ; *State v. Ray,* 209 N.C. 772, 184 S.E. 836 (1936) ; 2 Stansbury, *supra,* §§ 190, 191. This case is clearly distinguishable from the situation where the terms of an agreement are embodied in a document so that the document itself constitutes the contract of the parties and, therefore, is the best evidence of that contract. *See* 2 Stansbury, *supra,* § 191, and cases cited in footnote 27. In this case, the substance of the *conversation,* not the contents or terms of the recording, was directly in question. In a legal sense Bennett's recollection of the conversation was qualitatively as good as the recording. In a related situation in *Fox* the trial court admitted the testimony of the sheriff as to what defendant had confessed while allowing the production of a recording for corroboration. Our Court stated, "The fact that there was a recording of it did not prevent the sheriff from testifying as to what was said." *State v. Fox, supra,* at 26, 175 S.E. 2d at 576. Defendant's assignment of error is without merit and overruled.

[14]   Mrs. Branch next contends that the court erred in allowing into evidence the testimony of Mr. Ward concerning a four-minute call made at 8:07 a.m. on 30 March 1974 from a pay telephone at Pitt Memorial Hospital in Greenville to the telephone of Sullivan in Kinston. When the call was placed, the telephone operator noted the name "Connie" in her records. There was other evidence indicating that late in the evening of 29 March 1974 Connie Branch was at the Pitt Memorial Hospital where Mr. Branch had been taken following the shooting. Her husband was in critical condition until his death at 5:30 a.m. on 31 March 1974. These facts taken in context with other State's evidence were relevant to show the continued close contact between Mrs. Branch and Sullivan. *See Bank v. Stack,* 179 N.C. 514, 103 S.E. 6 (1920). It was admissible as circum-

stantial evidence of a continuing conspiracy. Defendant's assignment of error has no merit and is overruled.

[15] The question is raised whether the court erred in denying Mrs. Branch's request that the jury be instructed that State's Exhibits Nos. 16 and 17, which summarized evidence as to certain telephone numbers and calls, were being admitted for the limited purpose of illustrating the testimony of the witness. The exhibits were admitted during the course of the brief testimony of the last witness who testified before the charge to the jury was given. Although a preferable procedure would have been for the court to give the requested instruction at the time the request was made and in conjunction with the admission of this evidence, no prejudicial error was committed since (1) the judge gave the following complete instruction the next morning during the first part of his charge to the jury, "The photographs and diagrams are to be considered by you for no other purpose other than illustrating and explaining their [the witnesses'] testimony, if you find as a fact that it does illustrate and explain their testimony in this case," and (2) these blackboard diagrams summarizing certain telephone numbers and calls would not have the potential impact on the jury that other kinds of illustrative evidence would. For instance, the introduction of moving pictures of defendant's actions would have a much greater potential impact on the jury and might mandate an immediate instruction in order to avoid prejudicial error. See State v. Strickland, 276 N.C. 253, 173 S.E. 2d 129 (1970). For the reasons stated, defendant's assignment of error is without merit and is overruled.

[16] Mrs. Branch argues that the court erred in failing to grant her motion for judgment as of nonsuit as to the charges of conspiracy to commit murder and accessory before the fact to murder. "It is well settled with us that in passing upon a motion for judgment as of nonsuit in criminal prosecutions, the evidence must be considered in the light most favorable to the State; and when so considered, if there is more than a scintilla of competent evidence to support the allegations in the warrant or bill of indictment, it is the duty of the court to overrule the motion and to submit the case to the jury. Moreover, on such motion, the State is entitled to the benefit of every reasonable inference which may be fairly drawn from the evidence." State v. Davenport, 227 N.C. 475, 492-93, 42 S.E. 2d 686, 699 (1947).

"A criminal conspiracy is the unlawful concurrence of two or more persons in a wicked scheme—the combination or agreement to do an unlawful thing or to do a lawful thing in an unlawful way or by unlawful means. . . . *S. v. Whiteside,* 204 N.C. 710, 169 S.E. 711; *S. v. Lea,* 203 N.C. 13, 164 S.E. 737. No overt act is necessary to complete the crime of conspiracy. *S. v. Davenport,* 227 N.C. 475, 42 S.E. 2d 686. 'As soon as the union of wills for the unlawful purpose is perfected, the offense of conspiracy is completed.' *S. v. Knotts,* 168 N.C. 173, 83 S.E. 972." *State v. Goldberg,* 261 N.C. 181, 202, 134 S.E. 2d 334, 348 (1964). *See also State v. Horton,* 275 N.C. 651, 170 S.E. 2d 466 (1969). A criminal conspiracy may be established by circumstantial evidence from which the conspiracy may be legitimately inferred. *State v. Horton, supra.* Since Whealton's in-court identification of Mrs. Branch as the woman who met with him around 1 March 1974 and expressed her desire, both privately and in concurrence with Sullivan, to have her husband killed was properly admissible, the charge of conspiracy to commit murder, when considered in the light of all the other evidence, was fully supported and the motion as of nonsuit was properly overruled.

[17, 18] The three elements that must concur in order to justify the conviction of one as an accessory before the fact are as follows: (1) he counseled, procured, commanded, or encouraged the principal to commit the crime, (2) he was not present when the crime was committed, and (3) the principal committed the crime. *State v. Benton,* 276 N.C. 641, 174 S.E. 2d 793 (1970); *State v. Bass,* 255 N.C. 42, 120 S.E. 2d 580 (1961); G.S. 14-5. The State's evidence as to Mrs. Branch's meeting with Whealton around 1 March 1974, her telephone conversation with him on 27 March 1974, her close contact with Sullivan, and the actions of Whealton and Sullivan, fully support the allegation of accessory before the fact to murder, and the motion as of nonsuit was properly overruled.

[19] Mrs. Branch contends that the court erred in failing to maintain an impartial role throughout the course of the trial. The record indicates the following. After it became apparent that both defense attorneys were objecting to virtually every question and moving to strike all answers, the court suggested that they object in a certain order. The court occasionally stated its reasons for sustaining the defendants' objections. Once the court sustained its own objection and stated its reason for so

doing. Additionally, the court asked witnesses various clarifying questions and gave numerous instructions to facilitate the jury's role and maintain order in the court. Although the phraseology of the trial judge was not always ideal or such that it should serve as a model, it is clear from a careful examination of the record that the court did not conduct the trial in a partial manner or express an opinion in violation of G.S. 1-180. The conduct of a trial generally rests in the sound discretion of the trial judge. 7 Strong, *supra*, §§ 5 and 9. *See, e.g., State v. McEachern,* 283 N.C. 57, 194 S.E. 2d 787 (1973); *State v. Frazier,* 278 N.C. 458, 180 S.E. 2d 128 (1971); 1 Stansbury, *supra,* §§ 37 and 39, and cases cited therein. Defendant is "entitled to a fair trial but not a perfect one." *Lutwak v. United States,* 344 U.S. 604, 619, 97 L.Ed. 593, 605, 73 S.Ct. 481, 490 (1953). Defendant's assignment of error is without merit and overruled.

[20] Mrs. Branch asserts that the court erred in denying various motions for mistrial. Her first five motions for mistrial related to the following five statements. First, Whealton testified that Sullivan told him that Mrs. Branch registered him at the Lemon Tree Inn. Second, Whealton testified that Sullivan told him that Mrs. Branch wanted the killing done by the carport. Since both of these statements involved what Sullivan had said out of the presence of Mrs. Branch and directly implicated her, they were apparently inadmissible under the rationale of *State v. Wells,* 219 N.C. 354, 13 S.E. 2d 613 (1941). In a third statement, Whealton testified in apparent violation of the hearsay rule that Wiseman told him that he (Wiseman) could not kill Mr. Branch. A fourth statement was a voice identification by Whealton of Mrs. Branch as the woman with whom he had a telephone conversation on 27 March 1974. A proper foundation for such an identification was made shortly thereafter, and this same testimony was then properly admitted. In the fifth of these five statements, the prosecutor made the following remark immediately after he solicited from Whealton his testimony that he was a married man: "I just want to let it all come out, Mr. Whealton." In addition to the fact that these above five isolated statements were insignificant in context with the plenary competent evidence admitted in support of the State's case, it should further be noted that following each of the above statements the court allowed defendant's motion to strike and properly instructed the jury not to consider the statements made. Presumably the jury followed the court's in-

structions. *State v. Bruce,* 268 N.C. 174, 150 S.E. 2d 216 (1966).

Mrs. Branch's sixth motion for mistrial was based on Deputy Sheriff Stocks' and Deputy Sheriff Respass's violation of the court's sequestration order when they showed photographs of Mrs. Branch to Whealton during the noon recess. Deputy Sheriff Stocks did not testify. Deputy Sheriff Respass's testimony concerned the appearance of Mrs. Branch and the showing of photographs of Mrs. Branch to Whealton. It might be noted that we have previously determined and stated the reasons why the violation of this sequestration order did not taint Whealton's in-court identification of Mrs. Branch.

A seventh motion for mistrial was based on the admission of the testimony of Bennett as to his conversation with Sullivan when a recording, which had been made with the consent of Bennett, existed. As we previously stated, the best evidence rule was not violated and there was no prejudicial error in the admission of this testimony.

An eighth motion for mistrial was grounded on the fact that defendant stated that the above recording was not available for his examination. The recording was apparently in the possession of a South Carolina law enforcement officer who had been recalled to testify in South Carolina and had become ill. The State's suggestion that the court allow a one-day continuance was denied. Defendant made no motion for a continuance.

Mrs. Branch additionally made a general motion for mistrial after all the evidence was presented. The allowance or refusal of a motion for mistrial in cases less than capital rests in the trial judge's sound discretion and is not reviewable absent a showing of gross abuse of discretion. *State v. Foster,* 284 N.C. 259, 200 S.E. 2d 782 (1973) ; *State v. Daye,* 281 N.C. 592, 189 S.E. 2d 481 (1972). We have carefully examined defendant's contentions and conclude that there has been no showing of a gross abuse of discretion. The necessity of doing justice did not require the trial judge to declare a mistrial. *State v. Crocker,* 239 N.C. 446, 80 S.E. 2d 243 (1954) ; *State v. Wiseman,* 68 N.C. 203 (1873). The assignment of error is overruled.

[21]   Mrs. Branch assigns as error the following portion of the court's charge to the jury:

> "Counsel for defendants . . . have requested me to charge you in regard to circumstantial evidence. There is direct evidence in this case. Therefore, in the Court's opinion it is not necessary to charge on circumstantial evidence. However, I am charging on circumstantial evidence in this case because there is some circumstantial evidence, it appears to the Court. There is direct evidence, or eyewitness evidence, too, that the defendants committed the crimes that they are charged with. . . ."

Although this charge could by no means serve as a model, in substance it informed the jury that the court did not have to charge on circumstantial evidence since the jury could decide this case on the basis of direct or eyewitness evidence if it found such to be credible. The court was charging the jury on circumstantial evidence since the jury also could rely on that if the jury found that to be credible. Since the court had in unmistakable language previously informed the jury that it was the sole judge of truth and the credibility of the witnesses, it was evident that the above instruction was limited to the jury's finding such evidence to be credible. After the court gave a proper instruction on circumstantial evidence, it further clarified its above instruction:

> "However, as I indicated earlier, you do not have to rely entirely upon circumstantial evidence in this case, because the State contends that there is direct evidence in this case. And if you believe the evidence, there is direct evidence in the case."

By this instruction, the court indicated that the jury had to believe the direct evidence introduced by the State for it actually to be considered by the jury as direct evidence against defendant. When the court said there was "direct evidence," the court merely classified the evidence presented according to type for purposes of giving instructions on the law and by no means expressed an opinion as to the credibility of any of the evidence or the guilt or innocence of defendant.

Other portions of the charge fully delineate the roles of the judge and the jury and show that the judge did not express an opinion in violation of G.S. 1-180. For instance, the court explained its duty to summarize the evidence introduced, *giving*

*equal emphasis* to the evidence on both sides *without expressing an opinion.* Also, the court stated that the jury's recollection of the evidence was controlling in case of any conflict with the court's recapitulation of the evidence.

When the portion of the charge which is assigned as error is read in context with the rest of the charge, it is clear that the court in no way expressed an opinion in violation of G.S. 1-180. "A charge must be construed contextually, and isolated portions of it will not be held prejudicial when the charge as a whole is correct." *State v. McWilliams,* 277 N.C. 680, 684-85, 178 S.E. 2d 476, 479 (1971). *Accord, State v. Lee, supra.* This assignment of error is without merit and overruled.

[22] Mrs. Branch contends the court erred when it failed to charge concerning circumstantial evidence that "before any circumstance upon which the State relies may be considered by you as tending to prove the guilt of either defendant, the State must prove that circumstance beyond a reasonable doubt." The defendant did not specifically request the court to so charge.

The court charged as follows with respect to circumstantial evidence:

"The State contends in addition to the direct evidence, and the defendants deny it, that the circumstances in evidence, taken together, establish the guilt of the defendant. In other words, the State relies in part on what is known as circumstantial evidence. The State relies, furthermore, on what they consider to be direct evidence.

"Circumstantial evidence is evidence recognized and accepted as a manner of proof of a fact in a court of law. However, you must find the defendants not guilty unless the *circumstances considered together exclude every reasonable possibility of innocence and point conclusively to guilt* when you rely upon the circumstantial evidence." (Emphasis supplied.)

Although the above instruction is not sufficiently clear and exact to be approved as a model, it is manifest that the assignment of error made by defendant is untenable. This Court has on numerous occasions stated that there is no specific formula that must be used in charging the jury as to the degree of proof so long as the jury is clearly instructed that it must acquit unless it is fully satisfied, entirely convinced, or satisfied be-

yond a reasonable doubt of defendant's guilt. *State v. Shook,* 224 N.C. 728, 32 S.E. 2d 329 (1944). In this case the court had initially charged the jury, "The State must prove that a defendant is guilty beyond a reasonable doubt." When the court gave the above charge on circumstantial evidence, it was amplifying on this same concept and telling the jury in essence that it must be entirely convinced in order to convict defendant on the basis of circumstantial evidence. By giving the above charge, the court clearly informed the jury of the proper intensity of proof required to convict defendant. In the absence of a prior specific request for the charge now submitted by defendant, it is manifest that no reversible error was committed. *See also State v. Willoughby,* 180 N.C. 676, 103 S.E. 903 (1920). This assignment of error is overruled.

[23] Mrs. Branch assigns as error the failure of the court to include in its recapitulation of the evidence that Whealton on two occasions during direct examination failed to identify Mrs. Branch. G.S. 1-180 requires the court in its recapitulation of the evidence to state the evidence presented in a plain and correct manner *without expressing any opinion of the facts. Stanback v. Stanback,* 270 N.C. 497, 155 S.E. 2d 221 (1967). "The recapitulation of all the evidence is not required under G.S. 1-180. . . ." *State v. Sanders,* 276 N.C. 598, 617, 174 S.E. 2d 487, 500 (1970). A careful examination of the charge as a whole indicates that the recapitulation of the evidence was fair and fully complied with these standards. In fact, the jury was clearly reminded of Whealton's initial failures to identify Mrs. Branch when the court instructed the jury as to the circumstances enabling Whealton to identify Mrs. Branch during redirect examination. Furthermore, "[i]f defendant desired fuller instructions as to the evidence or contentions, he should have so requested. His failure to do so now precludes him from assigning this as error. [Citations omitted.]" *State v. Sanders, supra,* at 617, 174 S.E. 2d at 500. This assignment of error is without merit and is overruled.

[24] Mrs. Branch also assigns as error the portion of the court's charge referring to the defendant in the conjunctive. She contends that the court expressed an opinion in violation of G.S. 1-180 by linking the cases of defendants and, thus, causing the jury to believe that the evidence against each defendant was the same. Although the trial judge could have given a more explicit instruction as to each defendant, a careful examination

of the entire charge leads us to the conclusion that the charge was sufficient and fair. When the trial judge referred to defendants in the conjunctive, he almost always simultaneously cautioned the jury to remember that separate indictments were involved. He also charged that "a reasonable doubt as to the guilt of defendants, *or either one of them*" (emphasis supplied) mandated a verdict of not guilty as to the conspiracy charge. Finally, the court concluded its instructions by stating that the jury could find Mrs. Branch guilty or not guilty as to either or both of the indictments against her and that likewise they could find Sullivan guilty or not guilty as to either or both of the indictments against him. Thus, when the charge is read contextually, it is clear that the jury was properly informed that each defendant's guilt was to be judged separately as required by law. *State v. Tomblin,* 276 N.C. 273, 171 S.E. 2d 901 (1970). The court did not express an opinion in violation of G.S. 1-180 and this assignment of error is overruled.

[25] Mrs. Branch contends that her motion in arrest of judgment on the charge of being an accessory before the fact to first-degree murder should have been granted for the reason that the indictment did not expressly state that Mrs. Branch was not present when the murder was committed.

The indictment charged as follows: ". . . Connie Hardee Branch unlawfully and wilfully did feloniously be and became an accessory before the fact to the murder of Linwood N. Branch by counselling, procuring or commanding Matthew Jack Whealton and Harold Payne Wiseman to commit the felony of killing and murdering Linwood N. Branch; and in confirmation of said counselling, procuring or commanding of the said Connie Hardee Branch, they, the said Matthew Jack Whealton and the said Harold Payne Wiseman, on the 29th day of March 1974, did unlawfully, wilfully, and feloniously and with her malice aforethought, kill and murder the said Linwood N. Branch."

In interpreting G.S. 14-5 and G.S. 14-6 (accessories before the fact) this Court has stated that one of the elements for the conviction of a defendant as an accessory before the fact is that defendant was not present when the offense was committed. *State v. Benton,* 275 N.C. 378, 167 S.E. 2d 775 (1969); *State v. Bass, supra.*

Our Court has held that the crime of accessory before the fact is included in the charge of the principal crime. *State v.*

*Jones,* 254 N.C. 450, 119 S.E. 2d 213 (1961) ; *State v. Simons,* 179 N.C. 700, 103 S.E. 5 (1920) ; *State v. Bryson,* 173 N.C. 803, 92 S.E. 698 (1917). Since accessory before the fact is a lesser included offense of the principal crime, all the essential elements of accessory before the fact are present in the principal offense. As a general rule, the only distinction between a principal and an accessory before the fact is that in the latter case the defendant was not present when the crime was committed. *State v. Benton,* 276 N.C. 641, 174 S.E. 2d 793 (1970). In a number of states the distinction between a principal and an accessory before the fact has been abolished. 22 C.J.S., Criminal Law, § 90 (1961) ; 1 Anderson, Wharton's Criminal Law and Procedure, § 110 (1957) ; 40 Am. Jur. 2d, Homicide, § 28 (1968) ; 41 N. C. Law Rev. 118 (1962).

Thus we conclude that the allegations contained in this bill of indictment properly charge the offense of accessory before the fact to murder and are tantamount to alleging that the defendant was not present at the time the crime was committed. The indicment would "[L]eave no doubt in the mind of the accused and the court as to the offense intended to be charged." *State v. Cox,* 244 N.C. 57, 59-60, 92 S.E. 2d 413, 415 (1956). *Accord, State v. Partlow,* 272 N.C. 60, 157 S.E. 2d 688 (1967).

## SULLIVAN'S APPEAL

The questions raised by defendant Sullivan will be next considered.

Sullivan first contends that the trial court violated G.S. 1-180 and failed to maintain the "cold neutrality" mandated by the statute and by this failure denied him the right to a fair trial and the effective assistance of counsel. We have carefully examined the conduct of the trial judge and its effect on the jury as to Sullivan and have concluded for reasons similar to those given in our discussion of Mrs. Branch's related assignment of error that this assignment of error is without merit and is, therefore, overruled.

[26] Sullivan next contends that the testimony of Whealton was inadmissible for the reason that it was the fruit of the poisonous tree under the rationale of *Wong Sun v. United States,* 371 U.S. 471, 9 L.Ed. 2d 441, 83 S.Ct. 407 (1963). In *Wong Sun* an out-of-court statement of one co-defendant and some tangible evidence were held inadmissible against a second co-defendant because that evidence had been obtained by exploita-

tion of a primary illegality committed against the second co-defendant and not by means sufficiently distinguishable to be purged of the primary taint. Although it is not clear that the poisonous tree doctrine of *Wong Sun* would be applicable to evidence as reliable and inherently independent as the in-court testimony of a witness such as Whealton, it will be assumed *arguendo* that the *Wong Sun* doctrine extends that far.

An examination of the record indicates that the only possible illegality committed against Sullivan that might have led to Whealton's testimony against him was the fact that one telephone call that he had with Bennett was recorded on tape. Since the recording was made with the knowledge and consent of Bennett, there was clearly no violation of the federal wire tap law, 18 USC 2511 2(c) and (d). Moreover, there is apparently no Fourth Amendment search and seizure problem involved. As in *Lopez v. United States*, 373 U.S. 427, 10 L.Ed. 2d 462, 83 S.Ct. 1381 (1963), it was certainly proper for Bennett to report his conversation with Sullivan. Although in our case the tape recording was not introduced into evidence as it was in *Lopez v. United States*, whatever use might have been made of it to insure the accuracy of Bennett's report was proper. The language of the U. S. Supreme Court in *Lopez* is appropriate: "[T]he device was used only to obtain the most reliable evidence possible of a conversation in which the Government's own agent was a participant and which that agent was fully entitled to disclose." *Lopez v. United States, supra,* at 439, 10 L.Ed. 2d at 470, 83 S.Ct. at 1388. The legality of the recording in our case is further supported by the following language of the U. S. Supreme Court: "Neither this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." *Hoffa v. United States*, 385 U.S. 293, 302, 17 L.Ed. 2d 374, 382, 87 S.Ct. 408, 413 (1966). Furthermore, assuming *arguendo* that the recording was illegal, the recording was not necessary for the location and interrogation of Whealton since Bennett and others were fully cooperating with the State. Thus, there was clearly no violation of *Wong Sun* since there was apparently no primary illegality and the testimony of Whealton was obtained by means sufficiently distinguishable from the tape recording that it was purged of any primary taint. The assignment of error is overruled.

[27]  Sullivan also contends that the court erred in admitting the testimony of Whealton without allowing a voir dire examination of him. It seems to us that the proposed voir dire was of an exploratory nature. There is absolutely nothing in the record to indicate that the witness Whealton's rights had been violated or that he had complained about his treatment. He was a co-operative witness who became so because of a plea bargain. Whealton had indicated that "it was bothering me" and that he had told the truth to the officers in Virginia and was telling the same thing in this court.

To require the court to grant a voir dire for every witness would just mean that each case would be tried twice, once without a jury and once before the jury. This would unnecessarily complicate and lengthen the trial of already complex criminal cases. No voir dire is required, for the record as a whole demonstrates clearly the absence of any viable basis for excluding the witness's testimony. As we held in our discussion of Mrs. Branch's assignment of error as to the voir dire requested with respect to Bennett, the trial judge did not abuse his discretion. Sullivan's contention is without merit and overruled.

[28]  Next, Sullivan contends that the court erred in failing to provide a preliminary hearing. Without doubt, when this case was tried a defendant could properly be tried on a bill of indictment without the benefit of a preliminary hearing. *State v. Vick,* 287 N.C. 37, 213 S.E. 2d 335 (1975) ; *State v. Foster,* 282 N.C. 189, 192 S.E. 2d 320 (1972) ; *Gasque v. State,* 271 N.C. 323, 156 S.E. 2d 740 (1967) ; *State v. Overman,* 269 N.C. 453, 153 S.E. 2d 44 (1967).

Since the Pretrial Criminal Procedure Act (G.S. 15A-606(a)) was not effective until 1 September 1975, a preliminary hearing was not required under our law at the time of the trial. There is no showing of prejudice and the assignment of error is overruled.

[29]  Sullivan contends he was prejudiced by being forced to go to trial without adequate disclosure of certain evidence by the prosecution.

The record indicates that on 12 July 1974 Sullivan filed a discovery motion with the court in which he asked for, among other things, copies of reports of special tests made for the State, copies of all taped or otherwise recorded statements, in-

cluding the recordings of any taped or recorded confessions, or admissions of the defendant himself, all photographs made on behalf of the State to be used at trial, all photographs or other visual aids shown to witnesses for the purpose of the identification of defendant, all information which the State had in its possession favorable to the defendant, and all tapes of telephone conversations between the defendant and his alleged co-conspirators. The trial judge considered the motion on 9 October 1974 and allowed the defendant to discover some items requested, but did not allow the discovery of any of the evidence listed above.

G.S. 15-155.4 provides as follows:

"*In general.*—In all criminal cases before the superior court, the superior court judge assigned to hold the courts of the district wherein the case is pending, or the resident superior court judge of the district, shall for good cause shown, direct the solicitor or other counsel for the State to produce for inspection, examination, copying and testing by the accused or his counsel any specifically identified exhibits to be used in the trial of the case sufficiently in advance of the trial to permit the accused to prepare his defense; and such judge shall for good cause shown and regardless of any objection of the solictor or other counsel for the State, direct that the accused or his counsel be permitted to examine before any clerk of superior court, or any other person designated by the judge for the purpose, any expert witnesses to be offered by the State in the trial of the case regarding the proposed testimony of such expert witnesses.

"Prior to issuance of any order for the inspecting, examining, copying or testing of any exhibit or the examination of any expert witness under this section the accused or his counsel shall have made a written request to the solicitor or other counsel for the State for such inspection, examination, copying or testing of one or more specifically identified exhibits or the examination of a specific expert witness and have had such request denied by the solicitor or other counsel for the State or have had such request remain unanswered for a period of more than 15 days."

[This was repealed by the 1973 Session Laws; replaced by §§ 15A-901 through 15A-910, effective 1 July 1975, later made effective 1 September 1975 by the 1975 Session Laws.]

This statute providing for limited discovery is to protect defense and counsel against documentary evidence and the reports of experts being offered in evidence against them by surprise. *State v. Carey,* 285 N.C. 509, 206 S.E. 2d 222 (1974) ; *State v. Davis,* 282 N.C. 107, 191 S.E. 2d 664 (1972) ; *State v. Peele,* 281 N.C. 253, 188 S.E. 2d 326 (1972).

With regard to the tape recording, the only discovery admitted under our law is that provided by the law above cited. It is limited to documents and reports of experts "to be used in the trial." There is nothing here to indicate that the tape recording was to be used in the trial.

There was nothing here, more or less, than a fishing expedition sought by Sullivan, and the trial court was correct in disallowing the motion.

Defendant further contends under this assignment that he has been denied the right to have access to exculpatory materials as provided in *Brady v. Maryland,* 373 U.S. 83, 10 L.Ed. 2d 215, 83 S.Ct. 1194 (1963). But when you examine the motion, except for photographs alleged to have been used in pretrial identification of the co-defendant, Mrs. Branch, and the tape recording discussed above, there is absolutely no specificity to Sullivan's claims for information. There is nothing under our law that permits the discovery of photographs. As a matter of fact, the witness Whealton identified Mrs. Branch before any photographs were offered into evidence. There seems to be no prejudice to the defendant because of the State's alleged retention of these photographs for there is little benefit that they would have afforded the defendant in any event. As a matter of fact, it appears that the photographs of Mrs. Branch, taken from Sullivan's wallet, were made available to counsel for Sullivan.

As to the tape recording, the State did not attempt to offer it into evidence and there is nothing to indicate that it could have been authenticated sufficiently to permit its introduction. There is absolutely nothing here to indicate that the court could conclude there was anything exculpatory in the tape to which Sullivan was denied access.

[30]   With regard to a similar type motion, our Court in *State v. Gaines,* 283 N.C. 33, 45, 194 S.E. 2d 839, 847 (1973) in an opinion by Justice Huskins said: "The standards enunciated in *Brady* by which the solicitor's conduct in this case is to be

measured require us to determine whether there was (a) suppression by the prosecution after a request by the defense (b) of material evidence (c) favorable to the defense. Obviously, under *Brady* a refusal to grant a pretrial motion for discovery is not reversible error unless the movant shows that evidence favorable to him *was suppressed.* In order to do so, he must certainly show what that evidence was." Sullivan failed to meet the guidelines laid down by Justice Huskins in *Gaines.* The assignment of error is without merit and overruled.

[31]  Next, Sullivan contends the court erred in allowing a private prosecutor to assist in prosecuting him. The defendant in his brief concedes that it is clear that the trial judge in North Carolina may permit private counsel to appear with the solicitor to aid in the prosecution of a case. *State v. Best,* 280 N.C. 413, 186 S.E. 2d 1 (1972) ; *State v. Westbrook,* 279 N.C. 18, 181 S.E. 2d 572 (1971).

However, the defendant contends that the use of a private prosecutor in this case created an atmosphere in which it was impossible for the defendant to receive a trial consistent with the requirements of due process. But this was not a case where several seasoned prosecutors rode roughshod over defendants defended by inexperienced lawyers. The defendants were ably represented by counsel and it was certainly proper for the trial judge to permit Mr. L. W. Gaylord, a distinguished and respected attorney in Pitt County, to assist in the prosecution. This assignment is without any merit and is overruled.

[32]  Next, defendant contends that the trial court was in error (1) when it denied Sullivan's request for a continuance when he indicated that he wished to employ another attorney, (2) in failing to inquire of defendant the reason and circumstances underlying his request to employ other counsel, and (3) in failing to inform the defendant of his right to proceed without counsel.

The record indicates that upon the motion being made, proper inquiry was made by the court of Sullivan's attorney, who advised the court that Sullivan told him he wanted an additional lawyer and named the attorney. Mr. Harrison (Sullivan's attorney) told the court that he had made inquiry and determined that no other lawyer had been employed. Nevertheless, Mr. Harrison said he felt compelled to make the motion since his client had so requested.

At the time this motion was made the matter had been in the court some six months. Defendant had never made any com-

plaint about counsel before and never had made a motion for continuance before.

In *State v. Cradle,* 281 N.C. 198, 207, 188 S.E. 2d 296, 302 (1972), Justice Huskins speaking for the court stated:

> "A motion for continuance is ordinarily addressed to the discretion of the trial judge and his ruling thereon is not subject to review absent abuse of discretion. *State v. Stinson,* 267 N.C. 661, 148 S.E. 2d 593 (1966). However, when the motion is based on a right guaranteed by the Federal and State Constitutions, the question presented is one of law and not of discretion, and the decision of the court below is reviewable. *State v. Phillips,* 261 N.C. 263, 134 S.E. 2d 386 (1964).

> "The right to the assistance of counsel and the right to face one's accusers and witnesses with other testimony are guaranteed by the Sixth Amendment to the Federal Constitution which is made applicable to the States by the Fourteenth Amendment, and by Article I, Sections 19 and 23 of the Constitution of North Carolina. The right to the assistance of counsel includes the right of counsel to confer with witnesses, to consult with the accused and to prepare his defense. [Citations omitted.]"

Certainly defendant was ably represented by counsel. There is no abuse of discretion here, and no violation of defendant's constitutional rights by the court's refusal to continue the case.

The defendant cites *Faretta v. California,* 422 U.S. 806, 45 L.Ed. 2d 562, 95 S.Ct. 2525 (1975), as authority for his position that the court should have advised defendant of his right to proceed without counsel. This case stands for the proposition that a defendant has a right to proceed without a lawyer and not have counsel forced upon him against his wishes. Such is not the situation here. The assignment of error is overruled.

[33] Next, defendant contends that the court erred in failing to instruct the jury to disregard the misstatement of Sullivan's counsel concerning Sullivan's plea. The record indicated that when first called upon to plead, counsel for defendant said, "To both charges, the defendant enters a plea of guilty." Thereupon, defendant Sullivan stated, "Not guilty." And his counsel replied, "I beg your pardon. Not guilty."

Defendant contends that the court should have told the jury not to consider this and that the failure to so do prejudiced the defendant. Certainly there was no prejudice here. The jurors present could not have misunderstood what was going on. It was just a *lapsus linguae* on the part of counsel. The record does not even indicate that any jurors heard what was said. *See State v. Baldwin*, 276 N.C. 690, 174 S.E. 2d 526 (1970). There is no merit in this assignment and it is overruled.

Next, the defendant contends that the court committed error in not declaring a mistrial when the witness Whealton testified that Wiseman told him that he (Wiseman) could not kill Mr. Branch. For reasons similar to those stated in the appeal of Mrs. Branch, the assignment of error is overruled.

In addition, the defendant says the court was in error for failing to declare a mistrial when it developed that two deputy sheriffs had violated the court's order requiring sequestration of witnesses. For reasons similar to those stated with respect to Mrs. Branch's related assignment of error, this assignment is overruled.

Next, the defendant assigns as error the admission into evidence of certain miscellaneous, irrelevant, immaterial and incompetent evidence hereinafter discussed. The defendant contends that the State offered a number of witnesses who testified over objection about many transactions which were never shown to have much connection with the crimes charged against the defendant. Defendant contends this just confused the jury.

It must be understood that where a conspiracy is charged, the element of secrecy makes proof difficult at the very best. Usually it is shown by circumstantial evidence, although in our case there was direct evidence from Whealton plus supportive circumstantial evidence.

One of the transactions that Sullivan particularly complains about concerns the testimony of Taylor, a loan officer, to the effect that he made a loan to Sullivan in March, 1974, to purchase a crop dusting plane. Sullivan says this had no connection with the offense and was irrelevant.

This evidence is obviously relevant to the factual issue of the $5,000 cash payment to Whealton to kill Mr. Branch. For reasons similar to those stated with reference to Mrs. Branch's related contention, this assignment of error is without merit and overruled.

Sullivan also contends the numerous telephone calls discussed in Mrs. Branch's appeal were not admissible on the ground they were irrelevant or were hearsay. Some of these calls were clearly relevant and admissible under the hearsay rule for the reason they involved admissions by Sullivan during or after the termination of the conspiracy and implicated him in the criminal acts charged. 2 Stansbury, *supra,* § 167. Sullivan's remaining contentions are without merit for reasons similar to those stated in our discussion of similar assignments of error of Mrs. Branch. This assignment is overruled.

[34] Defendant Sullivan next assigns as error the admission of testimony by the witness Susan Bishop relative to the relationship between defendants Sullivan and Branch. Susan Bishop, a mobile telephone operator, testified over objection that the defendants came to her place of business in March, 1974, and stayed there ten or fifteen minutes. While they were there, they showed her an automobile they had just bought, and they also showed her two wedding rings and said they were going to get married. The witness said she recognized Connie Branch's voice and that she had heard the two defendants conversing over the telephone fifteen or twenty times in January, February, and March of 1974. The defendant contends that this evidence was inflammatory, irrelevant, and prejudicial to him. We concede that it was prejudicial to him, but the mere fact of prejudice alone is no reason for exclusion of evidence otherwise proper. 1 Stansbury, *supra,* §§ 8 and 80.

We are involved here with a conspiracy and this may be proved by circumstantial evidence. *State v. Martin,* 191 N.C. 404, 132 S.E. 16 (1926). As a matter of fact, direct proof of a conspiracy is rarely obtainable and it usually must be shown by a number of small acts, such as these, each of which standing alone might have little weight, but when taken together they point unerringly to the existence of the conspiracy. *State v. Lea,* 203 N.C. 13, 164 S.E. 737 (1932); *State v. Wrenn,* 198 N.C. 260, 151 S.E. 261 (1930). This assignment of error is overruled.

[35] Next, Sullivan says it was error for the court to enter judgment for conspiracy to commit murder from the facts of this case since the crime of conspiracy was subsumed under the crime of accessory before the fact to murder.

In this connection, Sullivan relies upon what has come to be known as "Wharton's Rule." The rule has been adopted in

certain state and federal courts "as an exception to the general principle that a conspiracy and the substantive offense that is its immediate end do not merge upon proof of the latter." *Iannelli v. United States,* 420 U.S. 770, 781-782, 43 L.Ed. 2d 616, 625, 95 S.Ct. 1284, 1292 (1975). Although "Wharton's Rule" was adopted in some jurisdictions more than a century ago, we find no reference to it in our case law. We have consistently enunciated the general principle that a conspiracy and the substantive offense do not merge upon proof of the latter. *State v. Carey,* 285 N.C. 509, 206 S.E. 2d 222 (1974) ; *State v. Brewer,* 258 N.C. 533, 129 S.E. 2d 262 (1963), appeal dismissed, 375 U.S. 9, 11 L.Ed. 2d 40, 84 S.Ct. 72 (1963) ; *State v. Lippard,* 223 N.C. 167, 25 S.E. 2d 594, cert. denied, 320 U.S. 749, 88 L.Ed. 445, 64 S.Ct. 52 (1943) ; *State v. Dale,* 218 N.C. 625, 12 S.E. 2d 556 (1940).

Assuming *arguendo* that Wharton's Rule would apply in any appropriate case in North Carolina, the facts of this case lead us to the conclusion that there can be no merger in this case. In the classic Wharton's Rule offenses—adultery, incest, bigamy, duelling—the harm attendant upon the commission of the substantive offense was restricted to the parties to the agreement. *Iannelli v. United States, supra.* Such is clearly not the case with murder.

Also, the question of merger is one of statutory interpretation. 1 Anderson, Wharton's Criminal Law and Procedure, Section 89, 90 (1957). In *Iannelli* the Supreme Court said the rule supports a presumption of merger absent legislative intent to the contrary. The Court then held that the legislative intent was clear and there was no merger. Our consistent construction of conspiracy to commit murder and the actual murder as separate offenses is supported by our Legislature's silent approval over the years and the inherent difference in the elements of these crimes. "Conspiracy is a completed crime when it is formed, without any overt act designed to carry it into effect. *State v. Carey, supra,* at 513, 206 S.E. 2d at 225. Accessory before the fact to murder is a lesser included offense of murder and has similarly never been interpreted as negating the separate offense of conspiracy. Our law as to accessory before the fact to murder primarily provides a different punishment from that accorded to the principal. It was not intended to relieve the party to murder who was an accessory before the fact from the penalty provided for conspiring with others. The assignment of error is overruled.

For reasons similar to those stated in the appeal of Mrs. Branch, Sullivan's assignment of error on the ground that there was a conjunctive charge is overruled.

[36]   Finally, Sullivan contends that the court was in error in not allowing his motion for judgment as of nonsuit. Our Court has held that "Upon the defendant's motion for judgment of nonsuit in a criminal action, the question . . . is whether there is substantial evidence of each essential element of the offense charged, or of a lesser offense included therein, and of the defendant's being the perpetrator of such offenses. If so, the motion is properly denied." *State v. Vestal,* 278 N.C. 561, 567, 180 S.E. 2d 755, 759-760 (1971).

We have here ample evidence of the involvement of Connie Branch and Roy Lee Sullivan in a conspiracy to murder Linwood Branch and in being accessories before the fact to that murder. The evidence tended to show that Whealton shot Linwood Branch with a pistol late in the evening of 29 March 1974; that Linwood Branch was admitted to the Pitt Memorial Hospital shortly thereafter and died about 5:30 a.m. on 31 March 1974; that an autopsy revealed that the cause of death was "penetrating wounds to the head consistent with a wound caused by a missile fired by a pistol." The defendant says this is not sufficient to show these injuries were the proximate cause of the death of Linwood Branch.

"On motion to nonsuit, the evidence must be considered in the light most favorable to the state and the state is entitled to every reasonable intendment thereon and every reasonable inference therefrom." 2 Strong, *supra,* § 104.

It is certainly a reasonable inference that the victim was shot by a pistol in the hand of Whealton and that the wounds inflicted therefrom caused Linwood Branch's death shortly thereafter. Other than the evidence of Whealton, there is evidence, both direct and circumstantial, that is overpowering. There was an abundance of evidence to take this case to the jury against Sullivan on both charges. The assignment of error is overruled.

In summary, as to both defendants, this trial consumed seven days. Each of the defendants was ably represented. The record consumed 483 pages. It seems to us that the volume of it could have been reduced substantially if the repetitious objections and exceptions had been by stipulation reduced for the purpose of the record. It would have made our job much easier.

Justice Moore, speaking for our Court in *State v. Cross*, 284 N.C. 174, 178, 200 S.E. 2d 27, 30 (1973), said: " 'This Court has repeatedly held that in order to obtain an award for a new trial on appeal for error committed in a trial of the lower court, the appellant must show error positive and tangible, that has affected his rights substantially and not merely theoretically, and that a different result would have likely ensued.' *State v. Cogdale*, 227 N.C. 59, 40 S.E. 2d 467 (1946). See also *State v. Beal*, 199 N.C. 278, 154 S.E. 2d 604 (1930) ; 1 Stansbury's N. C. Evidence, Brandis Rev. § 9 (1973)." There is no such showing here.

The defendants are "entitled to a fair trial, but not a perfect one." *Lutwak v. United States, supra.* A fair trial the defendants have had and we find

No error.

Chief Justice SHARP and Justice BRANCH concur in the result.